# In the United States Court of Federal Claims

No. 15-1017C

(Filed: July 7, 2016)

|  |  |  |
|---|---|---|
| **SARAH JEAN MEYER,** | ) | Military pay and disability claim; |
|  | ) | administrative separation based on |
| **Plaintiff,** | ) | nonjudicial conviction for malingering |
|  | ) | notwithstanding a referral by a Medical |
| v. | ) | Evaluation Board to a Physical Evaluation |
|  | ) | Board; application of Army Regulations |
| **UNITED STATES,** | ) | 635-40 and 635-200 |
|  | ) |  |
| **Defendant.** | ) |  |
|  | ) |  |

Andrew R. Rutz, Bosley & Bratch, P.C., Marion, Indiana for plaintiff.

Anand R. Sambhwani, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Elizabeth M. Hosford, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was Major Angela D. Swilley, Litigation Division, United States Department of the Army, Fort Belvoir, Virginia.

**OPINION AND ORDER**

Sarah Jean Meyer seeks military back pay and disability retirement benefits.  She enlisted in the Army and began training in 2010.  After an accident during training caused pain in her shoulder, ankle, and hips, a doctor ordered her to avoid a range of physical training activities, such as running and jumping.  But in the following month, several soldiers witnessed Ms. Meyer dancing vigorously.  Ms. Meyer was then charged with malingering and found guilty beyond a reasonable doubt in a nonjudicial proceeding under Article 15 of the Uniform Code of Military Justice ("UCMJ"), codified at 10 U.S.C. § 815.  The conviction was affirmed on appeal.  Subsequently, an Army medical board concluded that Ms. Meyer had medical conditions that made her physically unfit for military service and referred her to a physical evaluation board, which is a prerequisite to a medical discharge.  Despite that referral, the Army elected to halt the medical discharge process and instead administratively to separate Ms. Meyer for serious misconduct on the basis of her malingering conviction.  She was given a discharge under honorable conditions (general).  The Army Board for Correction of Military Records ("Army Correction Board" or "Board") upheld the Army's decision, which Ms. Meyer now challenges.  She requests that the court enter an order requiring the Army to provide a medical discharge, expunge the Article 15 proceeding from her record, and award roughly $123,000 in lost pay and

1

medical disability pay.  Pending before the court are the parties' cross-motions for judgment on the administrative record.  For the reasons stated, the court grants the government's motion for judgment in its favor.

# FACTS[1]

A. *Ms. Meyer Enlists and Subsequently Experiences Several Medical Conditions, Resulting in Doctor's Orders to Use Crutches and Convalesce*

Ms. Meyer enlisted in the Army on March 11, 2010 for a period of four years.  AR-1040 to -43.[2]  Before enlistment, she underwent a physical exam, which "did not reveal any disqualifying disabilities, defects, injuries, or illnesses."  Am. Compl. ¶ 1 & Ex. 1 (medical records dated February 18, 2010), ECF No. 13.  This physical exam rated her according to the "PULHES" scale: "P" is for physical capacity or stamina; "U" is for upper extremities; "L" is for lower extremities; "H" is for hearing and ears; "E" is for eyes; and "S" is for psychiatric.  *See* Army Regulation ("Army Reg.") 40-501 ¶ 7-3(c).  For each letter, the examinee is given a number from 1 to 4.  The number "1" represents a high level of medical fitness; a "2" indicates a physical defect "that may require some activity limitations;" a "3" signifies one or more medical conditions that "may require significant limitations;" and a "4" indicates "physical defects of such severity that performance of military duty must be drastically limited."  *Id.*  ¶ 7-3(d).  In Ms. Meyer's entry exam, she received a "1" in every category.  Am. Compl. Ex. 1, at 3.  She reported for duty on June 16, 2010 in Tampa, Florida, AR-1042 to -43, was assigned the rank of specialist (E-4), and was sent to Fort Leonard Wood, Missouri to begin training, AR-902.

On August 7, 2010, she appeared at an Army hospital stating that she had "got lost" and had a "panic attack" after a "battle buddy ran into her."  Am. Compl. Ex. 4, at 1-2.  Records of that hospital visit do not show any physical symptoms.  *Id.*  On August 9, 2010, a doctor and her commanding officers concluded that Ms. Meyer was "at risk for self-harm or harm to others.  Unit watch is being recommended."  *Id.* at 3.  Ms. Meyer would be permitted to continue training, however, she would not be permitted to participate in live-fire exercises.  *Id.*  The record does not explain why or how a doctor and her superiors reached that decision.

During training in September 2010, Ms. Meyer alleges she was injured when multiple ruck sacks were dropped on her while she was sitting in a truck.  Am. Compl. ¶ 10.  Ms. Meyer avers that she did not report the incident at the time, nor did she then seek medical attention, Am. Compl. ¶ 10, and there is no contemporaneous entry of this event in the administrative record.

---

[1]The recitations that follow constitute the court's findings of fact based on the administrative record filed pursuant to RCFC 52.1(a).  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355–57 (Fed. Cir. 2005); *Santiago v. United States*, 75 Fed. Cl. 649, 653 (2007) ("In accord with R[ule] 52.1, the court 'is required to make factual findings . . . from the record as if it were conducting a trial on the record.'" (quoting *Acevedo v. United States*, 216 Fed. Appx. 977, 979 (Fed. Cir. 2007))).

[2]The administrative record submitted by the Department of the Army pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC") is sequentially paginated.  Citations to the relevant page number appear as AR-__.

She did report the event to doctors and commanders later in 2010 and 2011.[3]  The Army has not disputed whether this event occurred, and on the contrary it has assumed the truth of her version of the event in the ensuing proceedings, as reflected in the medical and discharge records as discussed below.

On September 23, 2010, Ms. Meyer filled out a "trainee sick call slip," stating: "Both knees hurt.  Was injured in Basic and had X-Rays taken of my hip.  Might be nerve damage in right leg."  AR-957.[4]  She again filled out a sick call slip on September 28, 2010.  As the reason for her visit, she wrote: "Follow up from a Bone Scan.  Plus back pain and starting to hurt when I lift my left arm.  Back pain started two days ago."  AR-958.  Apparently in response to these sick slips, on October 4, 2010 a physical therapist filled out a DA Form 3349, giving Ms. Meyer a "temporary profile" and rating Ms. Meyer as an L-2 on the PULHES scale.  AR-959.[5]  Ms. Meyer was also prescribed physical therapy three times a week for two weeks.  *Id*.  On October 20, 2010, that same physical therapist recommended another two weeks of physical therapy.  AR-960.

On October 27, 2010, Ms. Meyer filled out another sick slip, explaining that "I was on [illegible] rest for 2 days, physical therapy for 2 weeks, nothing is helping my [illegible] knee, shoulder, back, hip.  I'm not getting enough rest to recover.  I would like con-leave.  Might be stress fractures, nerve damage."  AR-961.[6]  In response, Dr. Sandra Pavic ordered 48 hours of bed rest, "no duty, no details, no formations," and the use of crutches "at all times."  AR-962.

Ms. Meyer again visited the doctor on November 2, 2010.  AR-964.  Dr. Pavic rated Ms. Meyer as L-2 on the PULHES scale and noted that she was not capable of running two miles, nor

---

[3]In a letter dated April 29, 2011 to the Commander of the 1st Engineer Brigade at Fort Leonard Wood, Ms. Meyer claimed that "my whole world had changed when I sat down on the cattle truck one day in mid-September.  I had my ruck sack front loaded and the other soldiers who were standing passed over their rucks so more soldiers could fit in.  I was trying to help them move them down but they stopped moving them and I was pinned underneath about 8 or 9 ruck sacks.  While blocking my face from the metal frame, it dislocated my left shoulder, and the weight of them on my helmet caused two discs to become sticking out of my neck.  I tried to avoid going to CTMC but while doing "Muscle Failure" my hips started to hurt.  I didn't think much about it and soldiered on.  The next day was a run day and it was my last because my knees had locked up at a 30 degree angle and I could [not] make my legs go straight."  AR-912 (Letter from Meyer to Col. Allan Webster (Apr. 29, 2011) (requesting medical separation, rather than separation for misconduct)).

[4]The parties have not cited to any record evidence of these x-rays, and the court cannot locate any such evidence.  The court presumes that her comment about being "injured in Basic" refers to her claim that she was injured by piled ruck sacks.

[5]Army regulations provide that when a soldier has a temporary medical condition, a temporary profile may be granted limiting the soldier's physical activities.  Army Reg. 40-501 ¶ 7-4c.  Non-temporary profiles, *i.e.*, "permanent" profiles, may engender permanent activity restrictions and may lead to discharge from service.  *Id*. ¶ 7-4b.

[6]"Con-leave" may be a reference to "convalescent leave."  *See* Army Reg. 600-8-10 ¶ 5-5 (describing rules for granting a soldier leave to convalesce).

of doing push-ups or sit-ups. *Id*. Dr. Pavic set parameters for Ms. Meyer, writing that her maximum lifting weight would be 25 pounds or 2 miles distance, maximum running distance would be 2 miles, and maximum standing time would be 15 minutes. *Id*. On November 9, 2010, Ms. Meyer visited a neurologist, AR-982, and at some point near this time she received a CAT scan, although the record does not disclose whether that scan was of her shoulder, hips, legs, or feet, s*ee* AR-965 (setting out Ms. Meyer's request for results of her CAT scan). Ms. Meyer visited Dr. Pavic again on November 10, 2010 as a "follow-up" visit, complaining of problems with her left shoulder, neck, lower back, right foot, and ankle pain. AR-965. In response, Dr. Pavic ordered 21 days of limited physical activity. *Id*.

On November 15, 2010, Ms. Meyer was counseled by her platoon sergeant for disobedience and for acting in a manner that caused her superiors to question the extent of her injuries. AR-940. According to a counseling memorandum written by the platoon sergeant, Ms. Meyer left her assigned desk without permission from her superiors, apparently to go to a doctor's appointment. *Id*. The memo further elaborated that "this [counseling] action is due to your inconsistent behavior with wanting to be involved in training and then not wanting to be as well as your questionable activity while you are on your day passes during the weekends in regards to how injured you really are." *Id*. The platoon sergeant did not say specifically what had caused him to question her injuries. But he added that "[t]he possibility of your injuries being real is not in question, it is your choices and actions that make leadership question you." *Id*. As punishment, Ms. Meyer lost "pass privileges." *Id*. The platoon sergeant warned her that "[i]f this conduct continues, action may be initiated to separate you from the Army under A[rmy ]R[egulation] 635-200, Chapters 5, 9, 13, or 14." *Id*. In response to this counseling, Ms. Meyer informed her platoon sergeant that she disagreed with his assessment. AR-941. She furthered stated that "I am not faking my injuries. The doctors told me I have [fibro]myalg[i]a, heel spurs, left shoulder dislocated. Plus I thought it was better th[at] day to report to the CQ desk and heard nothing about appointment slips." *Id*.

Ms. Meyer again requested to see Dr. Pavic on December 1, 2010, at which time Dr. Pavic ordered another 25 days of limited physical activity. AR-968. On her sick slip, Ms. Meyer expressly requested to be given a "permanent profile." *Id*. Notably, a permanent profile involving a PULHES rating of 3 or 4 is grounds for medical discharge. *See* Army Reg. 40-501 ¶ 7-4b. The next day, Dr. Pavic rated Ms. Meyer as L-3 on the PULHES scale. AR-966.[7] On December 13, 2010, Dr. Sarah Knife, an orthopaedic surgeon, also rated Ms. Meyer as L-3. AR-969. Dr. Knife gave Ms. Meyer a temporary profile as follows: "No physical training. No running, jumping, marching, ruckmarching, squatting, lunging, climbing, or crawling activities. No lifting, carrying, pushing or pulling greater than 15 lbs. with left arm. Utilize crutches as instructed. Walk, other PT and physical activities not otherwise specified on this profile ok at own pace & distance/number/time, as tolerated." *Id*. Finally, Dr. Knife recommended that Ms. Meyer be

---

[7]At some point near this time, Ms. Meyer also visited a radiologist, writing on her own records "MRI, RT Ankle." AR-987. The parties do not cite or identify any evidence of a MRI or CAT scan in the administrative record.

reviewed by a Medical Evaluation Board to determine whether she could meet the Army's medical retention standards.  *Id*.[8]

By Ms. Meyer's own account she visited the doctor more than 28 times between July and December of 2010, complaining of the injuries described above as well as depression, bronchitis, and headaches.  AR-486 to -89.[9]  On January 27, 2011, one of her health care providers summarized her history as follows:

> [She] has had extensive evaluations, MRIs, bone scans, RADS, EMG, neurology consults[,] etc.  She has had essentially *no objective findings to substantiate her multiple complaints*.  I spoke with her counselor who assured me *she did not have somatization syndrome or another psych [diagnosis] which would account for her multiple complaints*.  Soldiers with multiple medical complaints do not have to train and can be rewarded financially.

AR-490 (emphasis in original).

B. *Ms. Meyer Is Seen Dancing, Contrary to Her Claims of Pain, Leading to Proceedings Under Article 15 of the Uniform Code of Military Justice in Which She Is Found Guilty of Malingering*

On January 10, 2011, four soldiers observed Ms. Meyer dancing.  One soldier reported that

> she was using a pole on one of the bunks to show us how a strip tease was done.  She was dancing around the pole of the bunk, using both of her legs. . .  She rolled onto her back and did a flip onto her stomach.  She did a [somersault] and then jumped onto her feet . . . like there was nothing wrong with her legs.

AR-871; *see also* AR-873 ("I witnessed SPC Meyer dancing. . . . She flipped, rolled around, and twisted."); AR-875 ("She was not limping on her hurt ankle that she says pains her so much. . . . She did a back flip roll over her dislocated shoulder without any signs of pain she usually displays."); AR-877 ("Spc. Meyer was dancing and flipping around with no problem.").  She was also seen doing splits.  AR-871.  One of the soldiers filmed Ms. Meyer's dancing and showed this video to her commanding officers.  *See* AR-830, -838.  Another witness further averred that "there was another occasion . . . Sept 24-Oct 14, 2010, SPC Meyer was in the

---

[8]On December 13, 2010, Ms. Meyer was counseled for failure to respect a non-commissioned officer.  AR-942.  According to a counseling memorandum drafted by a sergeant in her battalion, Ms. Meyer approached a command desk to ask for medication but was told to wait.  In response, Ms. Meyer said "I guess I'm not important enough," and then walked away.  *Id*.  When a sergeant subsequently approached her about the incident, Ms. Meyer "exhibit[ed] other gestures of disrespect."  *Id*.  The counseling memorandum warned Ms. Meyer that "[i]f this conduct continues, action may be initiated to separate you from the Army under A[rmy] R[egulation] 635-200, Chapters 5, 9, 13, or 14."  *Id*.

[9]Some of these visits appear to have been follow-up consultations related to prior appointments.

5

changing bay dancing around, bouncing around, and acting as if nothing was physically wrong." AR-873.

Consequently, Ms. Meyer's commanding officer, Lieutenant Colonel Christopher Drew, instituted non-judicial punishment proceedings against her on February 15, 2011, accusing her of malingering in violation of Article 115 of the UCMJ, codified at 10 U.S.C. § 915, which provides: "Any person subject to this chapter who for the purpose of avoiding work, duty, or service (1) feigns illness, physical disablement, mental lapse or derangement; or (2) intentionally inflicts self-injury; shall be punished as a court-martial may direct." AR-944 (charging papers). Pursuant to Article 15 of the UCMJ, codified at 10 U.S.C. § 815(a), Ms. Meyer was given an opportunity to demand trial by court-martial. *Id*. ("[Y]ou have the right to demand trial by court-martial instead [of permitting your commanding officer to decide the question of guilt]. In deciding what you want to do you have the right to consult with legal counsel located at Trial Defense Service."). Ms. Meyer did not exercise these rights, but rather initialed several boxes on a DA Form 2627 waiving trial by court-martial, requesting a closed hearing, waiving her right to have someone speak on her behalf, and stating she would be present at the proceeding in person. *Id*. On February 23, 2011, Lieutenant Colonel Drew found her guilty of malingering beyond a reasonable doubt. *Id*. As punishment, Ms. Meyer forfeited $733 of pay per month for two months, was reduced in rank, given extra duty for 45 days, and was restricted to the company area, dining facility, medical facility, and place of worship. AR-945.

Ms. Meyer filed an appeal on February 27, 2011, in which she did not deny dancing but instead offered the following mitigating statement: "During the video I was on five pain pills also listed in paper work." AR-1003. Captain Jennifer Donahue in the Office of the Judge Advocate denied the appeal on March 2, 2011 upon finding that the proceedings "were conducted in accordance with law and regulation and the punishments imposed were not unjust nor disproportionate to the offense committed." AR-945. Ms. Meyer filed no further appeals.[10]

C. *After Being Found Guilty of Malingering, Ms. Meyer Is Evaluated by a Medical Board, Which Recommends Referral to a Physical Evaluation Board for a Possible Medical Discharge*

An Army Medical Evaluation Board ("MEB") examined Ms. Meyer on March 10, 2011. AR 904. The MEB concluded that Meyer suffered from fibromyalgia, a right ankle osteochondral defect, chronic low back pain, chronic neck pain with degenerative disk disease and osteophytes, and chronic left shoulder pain. AR-904 to -05. The MEB further concluded that these conditions were the result of "a training incident in which [s]oldiers accidentally place[d] 8-9 rucksacks on

---

[10]On January 18, ten days after Ms. Meyer was seen dancing but prior to the Article 15 proceedings, Ms. Meyer was again counseled by her platoon sergeant, this time for possessing prescription drugs, including at least one prescription narcotic. AR-860. According to the platoon sergeant, her conduct violated Article 112a of the UCMJ, wrongful use or possession of a controlled substance, as well as a command policy against trainees possessing drugs, either legal or illegal. *Id*. He further alleged that her conduct violated Article 92 of the UCMJ for failure to obey a standing order that trainees not possess drugs. *Id*. Although no Article 15 proceeding or court-martial was initiated, Ms. Meyer was warned that such misconduct could be grounds for separation pursuant to Army Regulation 635-200. *Id*.

6

top of PV1 Meyer's left shoulder and neck while she was sitting in a truck." AR-905. Owing to these conditions, the MEB found Meyer "medically unfit" and recommended that she be evaluated by a Physical Evaluation Board ("PEB") for a possible medical discharge. *Id*.

### D. *Ms. Meyer's Commanding Officers Halt the MEB-PEB Process and Discharge Her for Misconduct Due to Her Conviction for Malingering*

On April 20, 2011, the commander of A Company, 554th Engineer Battalion, sent Ms. Meyer a letter informing her that he was initiating action to separate her from service pursuant to Army Reg. 635-200 ¶ 14-12c for commission of a serious offense. AR-919; *see also* AR-915 to -17. The company commander explained that his decision to begin the separation process was based on the following:

> 1. . . . On or about 13 December 2010, then Specialist Meyer was given a DA Form 3349 (Phy[]sical Profile) for neck, bilateral knee, bilateral ankle and left shoulder pain. The DA Form 3349 specified that then Specialist Meyer was to follow the following limitations set forth by Captain Sarah Knife, the orthopaedic surgeon who issued the Physical Profile. The[n] Specialist Meyer was not to conduct physical training, no running, jumping, marching, ruckmarching, squatting, lunging, climbing, crawling activities, no lifting, carrying, pushing or pulling greater than 15 pounds with left arm. Then Specialist Meyer was to walk, other Physical Training and physical activities not otherwise specified on the profile were okay and everything was to be at her own pace and distance/number/time, as tolerated. Then Specialist Meyer was to utilize crutches as instructed. On or about 20 January 2011, then Specialist Meyer was suspected of malingering after video footage of her was discovered by the unit. . . . The exhibited behavior indicates that there may be questions as to the validity and extent of Private Meyer's medical issues.
>
> 2. I am recommending that you receive a *general under honorable conditions* characterization of service.

AR-919 (emphasis in original). Ms. Meyer was notified of these proceedings on or before April 26, 2011. AR-913 to -14. On April 29, 2011 she wrote a letter addressed to the brigade commander requesting "that I may leave the military without it affecting getting further employment once I leave the Army." AR-912. She further admitted to dancing in violation of her temporary profile but explained that her fellow soldiers in training had peer-pressured her into dancing:

> Females can be quit[e] two faced; I know it's not easy always having to be a "Battle Buddy." I had many appointments and some of them had to sit outside in the cold to wait for me and be at my beck [and] call. I had told [one soldier] that it would kill my father if I had lost my rank, since he was drafted and became a SPC 5 within two years. [That soldier] battled me to chow and I had told her everything; even the part about my ex-job dancing. This clever female got a group of females together and begged me for a long time to dance for them. I kept on

saying "No I don't want to break my profile." I finally caved in because I didn't want to let my battle buddy down. Plus I figured they'd leave me alone. Little did I know I was being used . . . . I understand that what I did was wrong and shouldn't [have] caved in to these females."

*Id.*

Pursuant to Army Reg. 40-501, Ms. Meyer was required to undergo a mental status evaluation. AR-920. That evaluation found that she was mentally responsible and that she had the capacity to understand and participate in a discharge proceeding. AR-937. The evaluator further remarked that

> This service member has a relatively long history with Behavioral Health. Her attitude throughout has been that she is a victim of the Army, her battle buddies and her family. States that she has been neglected by the Army and that her injury was caused by a safety violation. Pvt. Meyer[] has had a continuing stream of complaints since she arrived in Behavioral Health and has been uncooperative in treatment by not doing the things that have been suggested to change her victim mentality. *As for malingering*, this provider believes that [Meyer] believes what she is telling everyone, it is a part of her victim mentality.

*Id.* (emphasis added).

On May 4, 2011, the battalion commander concurred with the company commander that Ms. Meyer should be discharged. AR-911. By May 23, 2011, Ms. Meyer had retained legal counsel and requested to be evaluated for medical discharge, rather than being separated for misconduct. AR-909. She specifically asked that her medical conditions be found insufficient to meet Army retention standards, and she further recounted how she was injured during training when ruck sacks were dropped on her left shoulder. *Id.* Nevertheless, on June 1, 2011 the brigade commander concurred that she should be discharged for misconduct. AR-910.

On June 8, 2011, Ms. Meyer's case was referred to the pertinent General Court-Martial Convening Authority, Major General David Quantock, to render a final decision. AR-904. As an initial matter, Army regulations required General Quantock to decide whether Ms. Meyer should be processed medically, owing to the fact that a MEB had referred her to a PEB, or administratively for misconduct. Army Reg. 635-200 ¶ 1-33b(2). General Quantock concluded that the administrative separation should supersede the medical separation process, checking "NO" next to the statement "[t]he [s]oldier's medical condition is the direct or substantial contributing cause of the conduct that led to the recommendation for administrative separation." AR-905. General Quantock further checked "NO" next to the statement "[o]ther circumstances of the individual case warrant disability processing instead of further processing for administrative separation." *Id.* General Quantock then ordered Ms. Meyer's separation pursuant to Army Regulation 635-200 ¶ 14-12c, for commission of a serious offense, on the basis of her malingering in violation of UCMJ Article 115. AR-904 to -06.

8

E. *Ms. Meyer Seeks Review of Her Discharge by the Army Discharge Review Board and the Army Board for Correction of Military Records, Which Both Deny Her Petitions*

Ms. Meyer filed a petition with the Discharge Review Board ("Discharge Board") on September 14, 2011, AR-896, which found that she was properly discharged for misconduct pursuant to Army Regulation 635-200, AR-892 to -94 (Discharge Board letter dated May 2, 2012). The Discharge Board found that Ms. Meyer "provided no independent corroborating evidence demonstrating that either the command's action was erroneous or that the applicant's service mitigated the misconduct or poor duty performance." AR-894.

Not accepting that result, Ms. Meyer filed a petition with the Army Correction Board on August 23, 2012. AR-745. Ms. Meyer requested: that her misconduct discharge be changed to a "medical" discharge; expungement of the Article 15 proceeding for "failing to observe the proper legal standard (beyond a reasonable doubt);" restoration of rank as a specialist; or referral to a PEB. *Id*. The Board denied her petition on March 28, 2013. AR-720 to -44. The Correction Board noted that she had been discharged for committing a serious offense – malingering – and that "[a]ll requirements of law and regulation were met and the rights of the applicant were fully protected throughout the separation process." AR-740. Turning to her argument that the Article 15 proceeding was in error, the Board noted that it "does not normally reexamine issues of guilt or innocence under Article 15 of the UCMJ." AR-741. Nonetheless, the Board commented that the evidence "confirms" that she violated Article 115 of the UCMJ, and that she submitted no evidence to show that her conviction and punishment were "untrue or unjust." *Id*. Moreover, the Board found that Ms. Meyer had waived her right to a court-martial, electing a closed hearing with her commander, whose decision would not be upset unless "clearly unsupported by the evidence." *Id*.

The Army Correction Board also specifically addressed whether Ms. Meyer was entitled to a medical discharge. AR-742. To that end, Ms. Meyer had argued that her disabilities were real, not fictional. AR-755 (Ms. Meyer's brief to the Board). However, the Board explained that the validity of her injury claims was not at issue:

> The key issue is not whether the applicant sustained any injuries during her military service. It is clear that she was found to have medically unacceptable conditions. This prompted an MEB. An MEB convened [and] found the applicant was diagnosed as having the medically-unacceptable conditions of fibromy[al]gia, right ankle osteochondral defect, chronic low back pain, chronic neck pain with degenerative disc disease and osteophytes, and chronic left shoulder pain. The MEB recommended her referral to a PEB.

AR-742. Rather, the Board explained that the issue was whether "the [s]oldier's medical condition is the direct or substantial contributing cause of the conduct that led to the recommendation for administrative separation and/or whether other circumstances of the individual case warrant disability processing." *Id*. (citing All-Army Activities Message 159/2012 (June 13, 2012)); *see also* Army Reg. 635-200, ¶ 1-33b(2) (stating the pertinent rule). In that respect, the Board found that Major General Quantock had "reviewed the applicant's separation packet and the evidence presented. This evidence included her profiles, MEB proceedings,

clinical records, and the nature of her misconduct. . . . [General Quantock] was in the best position to determine that the applicant's medical condition did not contribute substantially to her misconduct." *Id.* "It is clear the separation authority weighed the medical evidence against the other evidence presented and determined that the preponderance of the evidence warranted further administrative separation processing instead of disability processing." *Id.*

The Board further found no other basis to upgrade her discharge, finding she had been negatively counseled multiple times for disrespect, failure to follow instructions, and wrongful use of a controlled substance. AR-740; *see also* AR-860 (counseling Ms. Meyer for possessing prescription drugs contrary to policy); AR-940 (counseling Ms. Meyer regarding disobedience and possibly fake injuries); AR-942 (counseling Ms. Meyer for failure to respect a non-commissioned officer).

F. *Ms. Meyer Files an Action in This Court*

Ms. Meyer filed this action on September 14, 2015 and amended her complaint on January 6, 2016. The amended complaint asserts four counts alleging that the Army's conduct was irrational. Count One contends that the conviction for malingering is inconsistent with the MEB's finding that Ms. Meyer is medically unfit, and that the Army Correction Board erred by failing to reconcile these contradictory findings. Am. Compl. ¶¶ 38-46. Counts Two and Three assert that General Quantock essentially overruled the MEB despite not having the authority to do so. Am. Compl. ¶¶ 47-50, 55-61. Finally, Count Four asserts that the Army inconsistently characterized Ms. Meyer's malingering offense as "minor" for the purpose of Article 15 of the UCMJ and yet "serious" within the meaning of Army Regulation 635-200. Am. Compl. ¶¶ 62-70.

In seeking judgment on the administrative record, Ms. Meyer has focused on the central theme of these claims. *See* Pl.'s Cross-Mot. for Judgment on the Admin. Record and Resp. to Def.'s Mot. ("Pl.'s Cross-Mot.") at 2, ECF No. 23. In her brief supporting her motion, plaintiff states that "the issue" is "whether the [Army Correction Board's] concession that the plaintiff did *not* feign injuries . . . contradicts the finding that the plaintiff *did* feign injuries beyond a reasonable doubt according to procedure found in Rule of Courts-Martial 918." *Id.*

**JURISDICTION**

This court has jurisdiction under the Tucker Act, codified at 28 U.S.C. § 1491(a)(1), to hear claims for back pay arising under the Military Pay Act, 37 U.S.C. § 204, *see Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003), and claims for disability retirement pay arising under 10 U.S.C § 1201, *see Chambers v. United States*, 417 F.3d 1218, 1224 (Fed. Cir. 2005). Once the court's jurisdiction pursuant to such money-mandating statutes is established, the court may further "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records" when such an order would "provide an entire remedy and . . . complete the relief afforded by the judgment [on a claim for monetary damages]." 28 U.S.C. § 1491(a)(2); *see also James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) (holding that the court may enter such declaratory and equitable relief when "subordinate to a money judgment"). Accordingly, the court has jurisdiction to hear Ms. Meyer's claims of entitlement to back pay and disability pay.

**STANDARDS FOR DECISION**

In a case dependent upon an administrative record, a party may move for judgment upon that record pursuant to RCFC 52.1(c). In cases concerning military pay where the claim has been presented to a military board, the court's role is to review the decision of the board pursuant to the standards of the Administrative Procedure Act, codified at 5 U.S.C. § 706. *See Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009). Pursuant to these standards, the court shall set aside agency action if the plaintiff demonstrates that that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts have found an agency's decision to be arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Therefore, "[a]s long as the [military b]oard's action comported with the procedural standards mandated by statute or regulation, considered the relevant evidence, and reached a reasonable conclusion, the court will not disturb the [b]oard's decision." *Verbeck v. United States*, 118 Fed. Cl. 420, 424 (2014) (citing *Melendez Camilo v. United States*, 642 F.3d 1040, 1045 (Fed. Cir. 2011); *Helferty v. United States*, 113 Fed. Cl. 308, 316 (2013)).

**ANALYSIS**

A. *Whether the Article 15 Proceeding Complied with Law*

Ms. Meyer does not expressly challenge the validity of her Article 15 proceeding, instead focusing upon her separation from the Army. *See generally* Pl.'s Cross-Mot. Nonetheless, Ms. Meyer's brief challenges whether the evidence at the Article 15 proceeding was sufficient to meet the beyond-a-reasonable-doubt standard. Pl.'s Cross-Mot. at 4. When reviewing an Article 15 proceeding, the court applies a deferential standard: "[I]t is not this court's function to review the merits of findings of guilt . . . but only the disregard or violation of the Constitution, statute or regulations in the conduct of the proceedings." *Cochran v. United States*, 1 Ct. Cl. 759, 770 (1983); *see also Cappella v. United States*, 624 F.2d 976, 979-80 (Ct. Cl. 1980) (reviewing an Article 15 proceeding for compliance with the Constitution, statutes, and regulations). As relevant here, an Army regulation requires a finding of guilt beyond a reasonable doubt before imposing punishment in an Article 15 proceeding, and this court may review an Article 15 proceeding for compliance with that regulation. *Houghtling v. United States*, 114 Fed. Cl. 149, 158 (2013) (citing Army Reg. 27-10 ¶ 3-18(l)). However, the court must not "reweigh the evidence" or "delve into the Army's decision to administer such a punishment." *Id.*

The Army Correction Board's decision here readily passes muster under these standards of review. The Board concluded that Ms. Meyer's commander applied the beyond-a-reasonable-doubt standard, AR-740 to -41, and it further found that "the evidence of record confirms that [Ms. Meyer] violated . . . Article 115 of the UCMJ," AR-741. The Board's decision is itself supported by substantial evidence, which includes the affidavits of four soldiers, as well as video evidence and Ms. Meyer's subsequent admission that she was dancing. Although Ms. Meyer now argues

on brief that the MEB's findings contradict the Article 15 proceeding, those MEB findings came after the Article 15 proceeding, which was itself affirmed on appeal. *See also infra* (addressing plaintiff's argument that the results of the Article 15 proceeding and the MEB's findings were contradictory). Additionally, the Board noted that the Army had afforded Ms. Meyer the procedures required by law, offering her the right to demand trial by court-martial, a defense attorney, and an opportunity to appeal. AR-741. In these circumstances, the court "cannot identify any irrationality in the board's decision. It did not misapply [the beyond-a-reasonable-doubt] standard or fail to consider any evidence." *Houghtling*, 114 Fed. Cl. at 159.[11]

B. *Whether the Board Erred by Upholding the Army's Decision to Deny Ms. Meyer a Medical Discharge*

Ms. Meyer contends that the Board arbitrarily failed to reconcile "two incompatible findings." Pl.'s Cross-Mot. at 4. "First," Ms. Meyer says, "the MEB found that Ms. Meyer sustained injuries that disqualified her from military duty." *Id.* (citing AR-904 to -05). "Second, Ms. Meyer's separation authority found that Ms. Meyer feigned th[ose] same injuries. . . . The [Board] found that the evidence supported both findings, but failed to reconcile the incompatible evidentiary findings. This is arbitrary and capricious." *Id.*

Army Regulation 635-200 ("Discharge Regulation") governs separation of enlisted soldiers. *Clifford v. United States*, 59 Fed. Cl. 440, 443 n.4 (2004). Among other reasons, an enlisted soldier can be discharged for misconduct. *See* Discharge Regulation ¶ 14-12. Such misconduct may include a pattern of minor infractions, *id.* at ¶ 14-12a, or the commission of a single "serious" offense, *id.* at ¶ 14-12c. In pertinent part, a soldier may be separated for commission of a "serious offense" when the soldier commits a "serious military or civil offense, if the specific circumstances of the offense warrant separation and a punitive discharge is, or would be, authorized for the same or a closely related offense under the M[anual for ]C[ourts ]M[artial]." *Id.* ¶ 14-12(c). Notably, a violation of Article 115 of the UCMJ, codified at 10 U.S.C. § 915, is punishable by dishonorable discharge under the Manual for Courts-Martial. *See* Manual for Courts-Martial, Chapter IV, ¶ 40(e) (2012) (providing that malingering is punishable by forfeiture of pay, confinement for one year, or dishonorable discharge).

The discharge process begins when an enlisted soldier's "immediate commander determines that separation for acts or patterns of misconduct is in the best interest of the Service." Discharge Regulation ¶ 14-15. Once the immediate commander determines that separation is appropriate, he or she reports that finding to an intermediate commander, who in turn approves or disapproves the finding and then forwards the case to a final separation authority. *Id.* ¶ 14-16. For that purpose, "commanders who are General Court-Martial Convening Authorities (GCMCAs)" and any "general officer in command who has a judge advocate or legal advisor

---

[11]Plaintiff's citation to Rule for Courts-Martial 918, *see* Pl.'s Cross-Mot. at 4, is inapposite. The Rules for Courts-Martial apply to court-martial proceedings, not Article 15 proceedings. *See* Rule for Courts-Martial 101(a) ("These rules govern the procedures and punishments in all courts-martial and, whenever expressly provided, preliminary, supplementary, and appellate procedures and activities."). *Compare* 10 U.S.C. § 815 (establishing Article 15 proceedings), *with* 10 U.S.C. § 816 (establishing general, special, and summary courts-martial).

available" are authorized to approve or disapprove the separation or release from active duty of soldiers pursuant to this regulation. *Id*. ¶ 1-19. If the GCMCA concurs with the findings of the immediate and intermediate commanders, and if certain other conditions not applicable here are met, then the soldier is separated. *Id*. ¶ 14-17.

However, the regulations governing separation for misconduct include an exception for soldiers who have a medical condition. *See* Discharge Regulation ¶ 1-33. As a general rule, "disposition through medical channels takes precedence over administrative separation." *Id.* ¶ 1-33. Thus if a soldier is being processed for misconduct, and if a MEB refers that soldier to a PEB for "disability processing," then:

> The GCMCA may direct, in writing, that the Soldier be processed through the physical disability system when action under the UCMJ has not been initiated, and one of the following has been determined:
>
> (a) The Soldier's medical condition is the direct or substantial contributing cause of the conduct that led to the recommendation for administrative elimination.
>
> (b) Other circumstances of the individual case warrant disability processing instead of further processing for administrative separation.

Discharge Regulation ¶ 1-33(b)(1) (citing Army Reg. 635-40 ¶ 4-3b (in turn cross-referencing the Discharge Regulation)). Overlaying that regulation, the Army has also promulgated an All-Army Activities Message that amends the word "may" in the Discharge Regulation by replacing it with "must." *See* All-Army Activities Message 159/2012 at ¶ 4(B)(2) (June 13, 2012) (providing the GCMCA "must direct, in writing, whether to proceed with the" PEB referral). Thus when a soldier being processed for misconduct has been referred to a PEB, the GCMCA must determine whether the "medical condition is the direct or substantial contributing cause of the [mis]conduct" or whether other circumstances warrant disability processing in lieu of misconduct processing. *Id*. If so, then the medical process continues. If not, then the soldier may be discharged for misconduct despite having a medical condition that fails Army medical retention standards. *See Houghtling*, 114 Fed. Cl. at 149 (affirming a board's decision to uphold a soldier's separation for misconduct, despite referral to a PEB).

Applying these rules here, the Board found that the GCMCA properly determined that Ms. Meyer's injuries were not the direct or substantial contributing cause of her malingering. AR-742 to -43. The Board found that Major General Quantock "reviewed [Ms. Meyer's] separation packet and the evidence presented. This evidence includes her profiles, MEB proceedings, clinical records, and the nature of her misconduct." AR-742. The Board further concluded that Major General Quantock "weighed the medical evidence against the other evidence presented and determined that the preponderance of the evidence warranted further administrative separation processing instead of disability processing." *Id*. In particular, the Board noted that Major General Quantock found "the nature of [Ms. Meyer's] misconduct (malingering) had no relation to the

13

medical conditions listed on her MEB" and that no "other circumstances" warranted disability processing over administrative separation. AR-743.

These findings by the Board are rational and supported by substantial evidence in the record. Despite plaintiff's complaints of pain limiting her ability to train, and despite express physical activity limitations instituted by Dr. Knife, Ms. Meyer was seen dancing by four other soldiers. AR-871 to -77. Her dancing included a somersault and shoulder roll, both inconsistent with her claim of inability to perform training. *Id.* Ms. Meyer admitted to dancing, although she denied doing a somersault, and she offered only the mitigating statement that she was on pain pills while dancing. AR-1003. Further, while her medical history confirmed that she had injuries, other parts of her medical records indicated that she had "no objective findings to substantiate her multiple complaints," AR-490, and a mental healthcare professional had rendered an opinion that "as for malingering, this provider believes that [she] believes what she is telling everyone, it is part of her victim mentality." AR-937. Her dancing had thus put at issue the extent of her injuries and ultimately led to her conviction for malingering. AR-919.[12] For these reasons, the court finds the Board's (and Major General Quantock's) conclusion that her conditions did not directly or substantially contribute to her misconduct was supported by substantial evidence. *Accord Gay v. United States*, 116 Fed. Cl. 22, 32 (2014) (holding that Board had substantial evidence to conclude that a soldier's PTSD was not the direct or substantial contributing cause of his misconduct). This likewise supports a finding that no "other circumstances" warranted putting a stop to the administrative separation. On this point, the Board noted that Ms. Meyer's "other" actions included multiple instances of counseling for minor misconduct. AR-740. Overall, the Board's findings are especially appropriate considering that the relevant misconduct is evinced by a conviction in an Article 15 proceeding, such that the soldier's case before the Board amounted to, in essence, a challenge to the evidence presented in the Article 15 proceeding. *See Houghtling*, 114 Fed. Cl. at 158 (holding Army properly declined to permit a medical discharge in lieu of separation for misconduct, when plaintiff's misconduct was grounded in his conviction in a lawful Article 15 proceeding, such that plaintiff's case essentially amounted to a challenge of that proceeding).

Facing this substantial evidence, Ms. Meyer argues that Major General Quantock's decision was a *sub silentio* reversal of the MEB's findings that she was actually injured. Pl.'s Cross-Mot. at 5 (citing Army Reg. 40-501 ¶ 7-12 for the proposition that a commander may not reverse a medical board). This argument misconstrues Major General Quantock's decision, as well as the Board's affirmance of it. The Board expressly held that Ms. Meyer does have medical conditions, as found by the MEB. AR-742. Thus the existence of her medical conditions was not disputed. Rather, the question was whether those medical conditions were the direct or substantially contributing cause of her malingering. The court agrees that the fact that Ms. Meyer actually had several medical conditions is not inherently inconsistent with a finding that she also feigned injury as shown by her dancing. Under these circumstances, the Board's decision was not in error. *Houghtling*, 114 Fed. Cl. at 158.

---

[12]Notably, this was not the first time her injuries had been cast in doubt. In November 2010, her platoon sergeant had counseled her in part for conduct inconsistent with her injuries. AR-940.

14

*C. Whether the Board Erred in Upholding Ms. Meyer's Discharge for Committing a "Serious" Offense*

Ms. Meyer argues that the Army has arbitrarily classified her malingering charge as "minor" for the purpose of conducting an Article 15 proceeding, yet "serious" for the purpose of administrative separation under the Discharge Regulation ¶ 14-12(c). Am. Compl. ¶¶ 64-69. If Ms. Meyer is correct that an offense that is "minor" under Article 15 cannot be "serious" under the Discharge Regulation, that would mean the Army erred in separating her for misconduct on the sole basis of her malingering. Ms. Meyer nonetheless appears to have forfeited this argument by failing to raise it before the Board. *See* AR-745 to -59 (showing plaintiff's contentions before the Board, which do not include this argument). And although she raised the issue in her complaint, she failed to include it in her cross-motion for judgment on the record, compounding this procedural error. *See Qwest Gov't Servs., Inc. v. United States*, 112 Fed. Cl. 24 (2013) (addressing precedents holding that arguments not raised in a motion for judgment on the record are waived).

Even assuming this argument was preserved, the court finds it unpersuasive. An Article 15 proceeding is an administrative hearing conducted by a soldier's commanding officer, who decides whether the soldier is guilty and who then selects from a limited array of punishments. 10 U.S.C. § 815(b), (c) (listing punishments available). Unlike a court-martial, which resembles a judicial proceeding and which may enter any lawful punishment, an Article 15 proceeding was designed by Congress to resolve lesser violations of law, thereby serving "as a device for protecting the service member from the stigma of a court-martial, with consequent likely loss of later civilian job opportunities, and also protecting the military from the effect of a court-martial on the member's efficiency and morale." *Turner v. Dep't of Navy*, 325 F.3d 310, 314 (D. C. Cir. 2003). For this reason, the Armed Forces may only conduct Article 15 proceedings when the service member is charged with "minor offenses." *Hagarty v. United States*, 449 F.2d 352, 358 (Ct. Cl. 1971).[13] The term "minor offenses" is not defined anywhere by statute, and a commander has wide discretion to decide whether an offense is minor. *Turner*, 325 F.3d at 315. Upon judicial review, the courts generally weigh the "facts and circumstances" of the case to determine if an offense is "minor." *E.g.*, *Capella*, 624 F.2d at 979 (holding that a sailor was properly convicted in an Article 15 proceeding of violating Article 92, failure to obey a lawful order, for possession of narcotics because the circumstances of his crime was minor, even though he could have been imprisoned for up to ten years by a court-martial); *see also Hagarty*, 449 F.2d at 358. Because the meaning of a "minor offense" frequently "varies with context," a soldier's offense may be "minor" for the purpose of Article 15 jurisdiction yet "serious" for the purpose of administrative separation for misconduct. *See Turner*, 325 F.3d at 315 (making this observation in dicta after holding that a sailor's Article 15 proceeding was appropriate even though he would have faced up to ten years in prison in a court-martial on the same charge); *see also Bates v. Donley*, 935 F. Supp. 2d 14, 18-19

---

[13]Enlisted members of the Armed Forces facing an Article 15 proceeding also have a right to demand trial by court-martial instead, unless the enlisted member is attached to or embarked upon a vessel. 10 U.S.C. § 815(a).

(D.D.C. 2013) (noting that plaintiff was discharged for committing a "serious offense" after being found guilty in an Article 15 proceeding of disobeying orders).

Accordingly, there is nothing inherently contradictory in Ms. Meyer's being discharged for "commission of a serious offense" under the Discharge Regulation ¶ 14-12c on the basis of her Article 15 conviction for the "minor offense" of malingering. Malingering is the type of offense that is well-suited to administrative resolution by an immediate commander, *see Turner*, 325 F.3d at 315, and in the circumstances of Ms. Meyer's case it was "minor" within the meaning of Article 15. But malingering is also deleterious to military discipline, *see United States v. Doane*, 54 M.J. 978, 996 (A. F. Ct. Crim. App. 2001) (Burd, J., concurring) (discussing the serious nature of malingering), thereby fitting within the meaning of a "serious" offense under Paragraph 14-12c of the Discharge Regulation. In sum, the court cannot find that the Board's decision was contrary to law or arbitrary and capricious. Rather, the Board rationally found that the Army properly separated Ms. Meyer for commission of a serious offense on the basis of her malingering. AR-740 ("The evidence of record shows the applicant committed a serious offense – malingering.").

## CONCLUSION

The government's motion for judgment on the administrative record is GRANTED. Plaintiff's cross-motion for judgment on the administrative record is DENIED. The clerk is directed to enter judgment in accord with this disposition.

No costs.

IT IS SO ORDERED.

s/ Charles F. Lettow<br>
Charles F. Lettow<br>
Judge